IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. SCHUMAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

THOMAS A. SCHUMAN AND CARL SCHUMAN, APPELLANTS.

Filed October 18, 2022.    Nos. A-21-943, A-21-946.

Appeals from the District Court for Boyd County: MARK D. KOZISEK, Judge. Affirmed.

Michael J. Tasset, of Johnson & Mock, P.C., L.L.O., for appellants.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

MOORE, RIEDMANN, and WELCH, Judges.

MOORE, Judge.

INTRODUCTION

Following a consolidated jury trial in the district court of Boyd County, brothers Thomas A. Schuman and Carl Schuman were each convicted of one count of abandonment or cruel neglect of a livestock animal, resulting in serious injury, illness, or death in violation of Rev. Stat. § 54-903(1) (Reissue 2021), one count of abandonment or cruel neglect of a livestock animal, not resulting in serious injury, illness, or death in violation of § 54-903(1), and 13 counts of failure to properly dispose of a dead animal in violation of Neb. Rev. Stat. § 54-744(1) (Supp. 2009) (Repealed 2020). In their consolidated appeal, Thomas and Carl assert that the evidence was insufficient to support their convictions. We affirm.

STATEMENT OF FACTS

On July 28, 2021, Carl and Thomas were each charged by identical amended informations with 13 counts of abandonment or cruel neglect of animals, in violation of § 54-903(1), and 13

- 1 -

counts of failure to properly dispose of an animal between January 1, 2019, and March 12, in violation of § 54-744(1). The original informations are not included in our record. A consolidated jury trial was held over 4 days in August 2021.

A bomb cyclone, described by meteorologists as a winter hurricane, caused extreme weather and flooding in Nebraska on March 13, 2019. A key issue discussed at trial was whether the alleged abandonment or neglect, and improper disposal of the Schumans' livestock occurred as a direct result of the bomb cyclone.

The State presented the testimony of several community members who observed dead, as well as thin, cattle on the Schuman ranch prior to the bomb cyclone. A lineman traveled the roads around the Schuman ranch in January 2019 and February, and recalled "quite a few" dead cattle laying "all over" the ranch. The lineman also noticed that the Schuman cattle were much thinner than the cattle on other ranches he would pass. In February, a participant in a coyote calling competition drove past the Schuman ranch and saw a number of dead cattle and recalled a stench in the air. A neighbor who lives 1 mile from the Schuman ranch testified that in the months before the bomb cyclone, she saw dead cattle throughout the ranch. At one point, the neighbor and her children counted 30 dead cattle on the ranch, but the neighbor could not recall if this counting occurred before or after the bomb cyclone. The neighbor noted that she occasionally saw Thomas and Carl taking bales of hay out to the cattle, but that all the cattle were visibly skinny.

Boyd County Sheriff Clarence Wrede testified that he had received calls regarding the condition of the cattle on the Schuman ranch. One call was from an organizer of a coyote calling competition, who reported numerous dead cattle visible from the road outside the ranch. Prior to the bomb cyclone on March 13, 2019, Wrede drove to the Schuman ranch in an attempt to check the condition of the cattle but Wrede was only able to observe "bumps in the snow," which he presumed were dead cattle.

Wrede returned to the Schuman ranch around March 28, 2019. At that time, he drove along the Schuman property and photographed dead cattle on the ranch. Wrede was able to look into three different pastures and counted over 50 carcasses.

Several days later, Wrede returned to the Schuman ranch along with the county attorney. During that trip, Wrede observed that the snow had melted and he was able to count additional carcasses. Wrede then drafted an affidavit for a search warrant to inspect the cattle.

The search warrant was executed on April 9, 2021. Wrede was accompanied to the Schuman ranch by Investigator Brent Deibler of the State Branding Commission and Boyd County Deputy Sheriff Randal Kruse. Wrede and his team drove through the ranch and Wrede instructed Kruse to photograph the property. 117 of Kruse's photographs were entered into evidence. Wrede observed several dead animals in a creek on the property and along the road. Exhibit 109 was a photograph that depicted a "pile of carcasses" that was found about a quarter of a mile away from the Schumans' home.

As Wrede continued to drive through the ranch, he found 13 dead and three living cattle inside a dam on the property. Wrede noted that Exhibits 1, 4, and 5 depicted the dam and cattle he was describing. The cow pictured in Exhibit 4 has a large pile of manure behind her. Wrede estimated that the cow had been laying in the dam, unable to move, for 3 or 4 days. Because Wrede observed the three living cows to be in distress and unable to stand, he euthanized the animals.

Wrede then described the process of "mouthing" where one checks to see whether a cow has a full lower set of teeth. If a cow is missing their front two bottom teeth, they have a challenging time grazing and may become malnourished. Wrede mouthed two of the dead cattle found on the Schuman ranch. Wrede found that both had full sets of teeth, and therefore should be easily grazing, though they had been in poor health prior to their death.

Following the execution of the search warrant, Wrede provided care to the remaining Schuman cattle. Over 20 days elapsed from the time the ranch was searched to when the cattle were sold at auction. During these 20 days, the cattle were not treated with medication, but grazed in a pasture on the Schuman ranch previously closed off to the animals, and were fed hay and high protein lick tubs. Wrede stated that the change in diet, "made all the difference in the world." He described the cattle appearing fuller and less emaciated and noted that they "looked a lot better," than the day the search warrant was executed.

Wrede acknowledged that on the day he first went out to the Schuman ranch, he stopped to talk to Carl and informed him that the deceased cattle needed to be buried or disposed of. Carl told Wrede that the ground was frozen and he was unsure how he would be able to bury the carcasses. When Wrede returned to the ranch with the county attorney, some of the carcasses had been moved.

Wrede also stated that he had seen the Schumans feeding their cattle bales of hay, but maintained that the cattle were not being fed enough. Wrede conceded that other ranches had experienced livestock loss as a result of the bomb cyclone, though he had not observed dead cattle on any other ranch as he patrolled the roads in Boyd County.

Wrede discussed his interview with the Schumans on the day of the search. Despite his asking, neither of the Schumans informed Wrede of how many cattle they owned. The Schumans were unaware that any animals were in the dam, as they had last been fed 3 or 4 days prior and not checked since. The Schumans stated that they were unable to access the carcasses and were not able to move the live cattle because the corrals on the ranch were muddy. One brother also noted that he did not want to go out to the corrals because he experienced dizziness and was concerned he may fall.

Deputy Sheriff Randall Kruse's testimony regarding the search of the Schuman ranch on April 8, 2019, was consistent with Wrede's. Kruse described the ranch as "very desolate," with little grass for grazing, large areas of mud, and no hay or other feedstuffs in the pasture area for the cattle to eat. He estimated he observed over 300 dead cattle on the ranch. The vast majority of the live animals he observed were thin and weak, with little musculature.

Brent Deibler, a criminal investigator with the Nebraska Brand Commission, was also present for the search of the Schuman ranch. Deibler discussed two groups of photographs entered into evidence and noted that while they were taken in the same area of the ranch, they displayed differences in the dead animals. For example, the cow in Exhibit 93 was quite clean, whereas the cattle in Exhibit 87 was entirely covered in mud. Deibler explained that the different conditions indicated to him that the cows in Exhibit 87 died earlier than the one in Exhibit 93, as the bodies showed more signs of decay and were muddy. Deibler estimated that the cattle in Exhibit 87 had died prior to the bomb cyclone and the cow in Exhibit 93, afterwards.

While searching the ranch, Deibler took notes regarding the conditions of the rangeland. Most of the pastures he observed were "extremely short grazed." He observed some hay in the

stack yard on the ranch, and some remains of hay in that area as well. He found a pasture that had very tall and heavy grass that had not been grazed, but the gates to it were shut and the cattle were unable to access it.

Deibler also noted that the cattle he observed on the Schuman ranch covered a variety of conditions, ranging from nearly normal to very poor condition, "it wasn't all bad, it wasn't all good. There was a spectrum of all cattle."

Dr. Kirk Sholes, a veterinarian who has a cattle-focused practice, later joined the law enforcement officers on the search of the Schuman ranch. Sholes testified that a body condition score is a 9-point scale used to evaluate a cow's physical condition, 1 being very emaciated and 9 being obese. Optimal numbers are around 5 or 6 for cattle. The body condition score is ascertained by examining the fat content on the cow by either visual or manual means. Ideally, no vertebrae on the spine should be conspicuous and the hip bones should not be obvious either.

Sholes discussed various photographed cows and their body condition scores. The cow photographed in Exhibit 10 would be scored at a 2 or 3 because her bones showed through her hide. Sholes observed the cow would be unable to keep herself warm in cold weather because of the lack of fat. An animal in that condition is subject to greater exposure from cold and wet weather, and thus to disease, as the immune system becomes compromised. The animal's condition in Exhibit 10 strongly suggested it had been underfed. Sholes rated the animal in Exhibits 33 and 34 at a 3 or 3.5 on the scale, suggesting that she too is malnourished. Exhibit 41 and 42 similarly show an underfed cow that Sholes rated at a 3 or 3.5 on the scale. Sholes stated that all animals discussed were in a condition that exposed them to a substantial risk of death and that the treatment for malnourishment is simple: feed the cattle more and better food, and treat for parasites if necessary.

Sholes discussed the animal he had performed a post mortem examination on; a cow shown in Exhibit 120, which Sholes described as in "dire straits." Sholes testified that the time of death greatly affects decomposition, and decomposition negatively affects the effectiveness of the post mortem, at times making it impossible. The animal Sholes conducted the post mortem on had been euthanized roughly 1 hour before he began to examine it, making it a good candidate.

Exhibits 46 through 49 were photographs of the post mortem conducted on the animal. Sholes explained that examination showed no evidence of any sort of lung disease which would cause the animal's condition. Sholes also noted a lack of fat under the skin at the bottom to the chest cavity, which indicated to him that the animal had been expending more energy than it had been taking in. He also observed a very minimal amount of fat at the base of the heart, and that a healthy animal would have more there, as the fat around the heart is one of the last fat reserves to be depleted as an animal loses condition. There was also a distinct lack of fat around the kidneys, and if the animal were in normal condition, Sholes would have had to peel the fat away from the kidney in order to examine it. Based on his post mortem, Sholes concluded that the animal had been receiving suboptimal care and feeding. Further, the emaciation present in the cow would take weeks to months to occur.

Sholes testified that once the animal dies, the bacteria in the gastrointestinal tract produces gas that causes the animal to bloat. The speed of decomposition and bloat depends on environmental conditions, but starts immediately upon death. Sholes observed that the cow in Exhibit 11 had been dead for quite some time because there was little hide left and the bones,

which were well exposed and bleached, which told him that the animal had been dead for at least 30 days or more. The same was true of the animals depicted in Exhibits 15, 44, 70, 77, 82, 107, and 110. Sholes noted that some of the pictured animals appeared to have been dead for as much as 3 months, possibly longer.

In Sholes' opinion, the cause of death of the 13 animals found at the dam was secondary to malnourishment and exposure. Meaning that if the animals had not been malnourished, they would have been able to escape the mud and remove themselves from the dam. Sholes believed that the cattle's malnourishment lead directly to their exhaustion and death.

Sholes observed that the pasture he was in during the search had very little forage for the cattle. There was one bale of feed, which consisted of poor quality alfalfa. It would have been fairly unpalatable to the cows, and the poor condition of the feed would have negatively affected its nutritional value.

Tyler Carson, a brand inspector, testified that he had been to the Schuman ranch in April 2019 to help in the roundup of their cattle. Carson had helped gather the cattle, push them into a holding pasture, and then load them for transport. While he was on the Schuman ranch, he observed dead cattle "from one end to the other. Pretty much everywhere you looked." He estimated at least 200 dead cattle and observed the dead cattle to be in various stages of decay. This indicated to Carson that the cattle had been dying for some time. He described the live cattle he helped round up as in poor condition.

Carson testified that in his experience as a rancher and brand inspector, he was familiar with the grazing practices in Boyd County, and that it takes 10 to 12 acres of grassland to graze one head of cattle for summer grazing from May to November. He estimated there were a total of around 900 cattle, living and dead, on the Schuman ranch, and it would take a 9,000 acre ranch to adequately summer graze that many cattle. However, more cattle could be run on a smaller ranch with supplemental feed.

Cody Dillon, a third-generation rancher, testified that he had also been hired to help round up cattle on the Schuman ranch in April 2019. Dillon observed the cattle could not all be moved at one time because they did not have the energy or ability to move. The cattle would "just fall down" and could not go any farther, despite only needing to be moved 3 or 4 miles. In Dillon's experience that was very uncommon, as he was usually able to move cattle 20 miles a day without an issue.

Dillon testified he saw no hay on the ground for the cattle to eat. He saw one haystack on the ranch, and it appeared to be poor quality. He compared this to most ranches that have 3 or 4 hay yards scattered around so that the cattle have easy access to hay.

Dillon acknowledged that sometimes cattle come through winter looking a little out of condition, but with correct nutrition, a hard winter should not bother an animal at all. Dillon did not believe the winter weather experienced in 2019 explained the condition of the Schuman cattle. A normal herd will frolic, run, and bawl and none of that was occurring with these low-energy cattle.

Bradie Dillon also assisted with the roundup of the Schuman cattle and testified consistently with her husband, Cody. Bradie described the rangeland on the Schuman ranch as bare, with no vegetation. It took 8 days to round up 700 cattle because the cattle were scattered all over the ranch and were in such poor condition that they had to be moved in stages.

After the State rested, the Schumans moved for a directed verdict. The district court granted the Schumans' motion for directed verdict on three counts of abandonment or cruel neglect of animals. The court found that because Sholes had testified that the three living cows found in the dam had no serious injury or illness creating a substantial risk of death, the State had failed to make a prima facie case on those counts. The Schumans also moved for dismissal of the 13 counts of failure to properly dispose of an animal, because Sholes could not say how long the animals had been dead. The court found the relevant time period to be a question of fact for the jury to resolve, and denied the Schumans' motion related to proper disposal.

The Schumans then presented their case. Several neighboring ranchers testified that neither Thomas nor Carl would intentionally, knowingly, or recklessly endanger their cattle by refusing to feed them adequately or provide proper care for them. Neighbors frequently observed the Schumans feeding their cattle as they drove past the Schuman ranch or sold hay directly to the Schumans.

Neighbors also lost some cattle during the bomb cyclone. However, one neighbor said that he lost only about 5 percent of his herd, or a dozen of his 250 cattle, to the storm. Another lost only a couple of cattle who wandered into the storm. Neighbors also acknowledged that they saw a few dead cattle on the Schuman ranch prior to the storm. They were unable to say how many bales of hay the Schumans were feeding their cattle or how many cattle were on the ranch in total. One neighbor stated that he checks his cattle at least daily, and that there would be some danger if one waited 4 or 5 days between checks.

Thomas testified that he had lived on this ranch all his life, except for the years he was at college. He described the ranch as about 2,500 acres. The terrain is hilly with a creek that wanders through the property, and several dams on it. He estimated that in 2018, they had over a thousand head of cattle. Thomas did not know the exact number of cattle as they were generally out in pasture, so it was hard to count them.

Thomas said the 2018-2019 winter was difficult, but not the worst he had seen. He described the March bomb cyclone as incredibly violent, noting that the power went out as a result of the storm. The storm also damaged the highway and the rural water line. The brothers fed the cattle to the best of their ability, considering that the mud was very deep and it was difficult to get around on foot. Thomas knew there was going to be a considerable livestock loss because of the severity of the storm, and "even good conditioned cattle would have had a difficult time surviving that storm." The brothers grew hay for the cattle on land south of the ranch, but were unable to access it at the time of the bomb cyclone because the roads were damaged.

Thomas then identified the cattle in various photographs. He identified exhibit 67 as an older cow, not in the best of shape, but a "viable cow." He assumed the cow had died in the flood caused by the bomb cyclone.

Exhibits 87, 88, and 89 featured dead cattle covered in mud by empty feeder troughs. Thomas placed the feeder troughs about a quarter of a mile north of the house, and explained that they no longer used the feeding troughs, but that the troughs acted as a windbreak for the cattle in bad weather. Thomas testified that cattle gather in a big herd to say warm, especially behind a windbreak, and as they mill around they churn up the ground and the cattle then get stuck in the muddy ground. It was likely that the cattle in Exhibits 87, 88, and 89 died during the bomb cyclone.

Had Thomas known the cattle were congregating in that area, he would have "chased them out of there," but he was unable to go out into the "life-threatening" storm.

Thomas testified that the dead cows shown in Exhibit 1 were stuck in the muddy dam, and that the dam cannot be seen from anywhere on the ranch except for on the hilltop directly above it. Because the pasture had been grazed the previous summer, there was not anything for the cows to feed on in that area. Therefore, the brothers did not check the area for cattle and were unaware cows were entering the dam.

Related to the dead cows pictured in Exhibit 108, Thomas said that he created the pile of carcasses. Several cattle had been feeding in a field and were then covered with snow and died. When the snow melted and the brothers discovered the carcasses, they "piled them up in a pile to compost them" as an alternative to burial because the ground was frozen. The area had served as the Schumans' burial site for many years.

Thomas testified that they feed their cattle a variety of hay, including prairie hay and alfalfa. Thomas and Carl utilized both a processor, which distributes hay on the ground in a "nice neat row" for the cows to graze from, and self-feeders, which can be filled with bales of hay for the cows to access. Part of the Schumans' feeding strategy was to graze cattle on part of the ranch one year, then move them to ungrazed land the next so that the grazed grass could recover. Thomas said they were about a week away from moving the cattle to the ungrazed land, but when the storm occurred they opted to give the cattle stored feed rather than move the cattle to another area of the ranch.

Thomas maintained that they put out adequate hay for the cattle, but not an excessive amount because the cattle would trample leftover hay. Thomas was unable to recall the number of bales put out for the cattle between January 2019 and March. He conceded that he did not follow the University of Nebraska's feeding guidelines of 25 pounds of feed a day, per grown cow. When shown the cows pictured in Exhibits 67, 87, 93, and 101, Thomas could not say when each cow had died. He did not disagree with Sholes' testimony that the cow in Exhibit 4 had been stuck in the dam for 4 or 5 days.

Carl Schuman testified that he lives with his brother on the ranch, and had since 1950. Carl estimated that in 2018 and 2019 they had 700 "mama cows," but did not know how many calves they had, nor how many bulls. Carl agreed that the winter of 2018-2019 contributed to the declining condition of some of the cows in the herd, and he could not think of anything that would have prevented it. He and Thomas were feeding cows consistently during that winter.

Carl testified that he had not been up to the dam shown in Exhibit 1 for 4 or 5 days, but that he had been there sometime after the storm and saw no cattle due to the snow cover. He only discovered there were cattle at the dam the day Wrede conducted his search of the ranch. Carl noted that while a loss of cattle occurs every winter, they lost more cattle in 2019 than in any other year.

After the Schumans rested their case, they again moved for a directed verdict, which was overruled by the district court.

The State called Sholes as a rebuttal witness, and he testified to the recommendations for how many pounds of hay and alfalfa should be fed depending on the body weight of the animal. When deciding how much to feed, it is important to know how many head you are feeding, as a miscount by even 300 head could have a significantly adverse effect on the animals by

underfeeding them. If the number of cattle to be fed is underestimated, coupled with poor quality food, the animals' malnutrition would be significantly compounded. Sholes stated that most of the cows he saw on the Schuman ranch should weigh roughly 1200 pounds if they were in good condition, and a 1200 pound cow should get 25 to 30 pounds of feed a day, depending on the weather. A calf weighing 600 pounds would get half that much, 12 to 15 pounds per calf per day.

The jury returned verdicts finding Thomas and Carl guilty of one count of abandonment or cruel neglect of a livestock animal resulting in serious injury, illness or death; guilty of one count of abandonment or cruel neglect of a livestock animal not resulting in serious injury, illness or death; and guilty of all 13 counts of failure to properly dispose of a dead animal. The jury found Thomas and Carl not guilty of eight counts of abandonment or cruel neglect of animals.

On October 25, 2021, the district court imposed identical fines of $2,800 and prohibited both Thomas and Carl from owning or possessing livestock for a period of 5 years.

Thomas and Carl appeal.

## ASSIGNMENTS OF ERROR

Thomas and Carl assign that there was insufficient evidence to prove that they had (1) "recklessly neglected the cattle found in and around a dam on their ranch," and (2) "failed to timely dispose of their dead animals." Brief for appellants at 3.

## STANDARD OF REVIEW

When reviewing the sufficiency of the evidence to support a conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Worthman*, 311 Neb. 284, 971 N.W.2d 785 (2022). Whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *Id*.

## ANALYSIS

*Abandonment or Cruel Neglect of Livestock.*

Thomas and Carl allege that the State's evidence was insufficient to prove that they "recklessly neglected" their cattle found in and around the dam on their ranch. They argue that the jury was left with no meaningful criteria by which to judge the Schumans' failure to check the dam, and that the Schumans had no legitimate reason to do so. We interpret this assignment of error to be related to the Schumans' convictions of two counts of abandonment or cruel neglect of animals.

The Schumans were convicted under § 54-903(1), which states:

[A] person who intentionally, knowingly, or recklessly abandons or cruelly neglects a livestock animal is guilty of a Class I misdemeanor unless the abandonment or cruel neglect results in serious injury or illness or death of the livestock animal, in which case it is a Class IV felony.

- 8 -

To prove that the Schumans committed abandonment, the State was required to establish that the Schumans left an animal in their care, for any length of time, without making effective provision for the livestock animal's feed, water, or other care as is reasonably necessary for the livestock animal's health. See Neb. Rev. Stat. § 54-902(1) (Reissue 2021). To prove that the Schumans committed cruel neglect, the State was required to establish that the Schumans failed to provide a livestock animal in their care with feed, water, or other care as was reasonably necessary for the livestock animal's health. See § 54-902(5).

The State notes in its brief that the Schumans have misstated the charges and convictions as "reckless neglect." Brief for appellee at 27. We agree, as the statute requires proof that a defendant "intentionally, knowingly, or recklessly abandons" livestock or "cruelly neglects" livestock. See § 54-903(1). The statute does not contemplate reckless neglect.

Turning to the evidence, all individuals who participated in the April 2019 search and roundup of the Schuman ranch testified to the desolate conditions of the rangeland. Kruse noted that there was little grass for grazing and large areas of mud. Sholes observed that one pasture had little forage and only one bale of hay. Dillon likewise saw only one haystack on the ranch. Bradie described the rangeland as bare, with minimal vegetation. Deibler noticed that the pastures were short grazed. One pasture that had tall grass for grazing was closed off to the cattle.

The State also presented testimony from many who observed a majority of the cattle to be thin, weak, and with little musculature. Both passerbys and those who spent extensive time on the ranch commented on the thin cattle. The cows were lethargic and became exhausted during the roundup, though they had to walk only a few miles. Those who assisted in the roundup found the cattle's lack of energy to be highly unusual and did not believe the winter weather could account for the cattle's condition. Wrede had mouthed two cows and found that both had full sets of teeth, and therefore should have been grazing without issue. Additionally, within a span of 20 days, the cattle began to put on weight after being fed an appropriate amount of feed by Wrede.

Sholes gave several cows a body condition score of 2 to 3.5 and observed that the cattle's condition demonstrated malnourishment. Those cows with a low body condition score were in a condition that exposed them to a substantial risk of death. Sholes also described a post mortem he had conducted on a recently deceased cow, and that he found minimal fat around the cow's heart and kidneys. This indicated to Sholes that the animal had been receiving poor care and feeding for weeks to months, as the animal had used nearly all of its fat reserves. Sholes further attributed the cattle's malnutrition as a cause of death for the cows found in the dam. Had the cows been adequately fed, Sholes believes they would have had the strength and energy to escape the mud and remove themselves from the dam.

Thomas was unable to recall the number of cattle he and Carl owned, and conceded that he did not follow the University of Nebraska's feeding guidelines of 25 pounds of feed a day, per grown cow. Sholes reiterated the University of Nebraska's feeding guidelines as the proper recommendation and noted that miscounting a herd may lead to underfeeding and other adverse effects on the animals.

After viewing the evidence in the light most favorable to the prosecution, we conclude that a rational finder of fact could have found that the State proved beyond a reasonable doubt that Thomas and Carl had, on at least two occasions, either left or failed to provide for an animal in their care, for any length of time, without making effective provision for the livestock animal's

feed, water, or other care as is reasonably necessary for the livestock animal's health. Further, the evidence was sufficient to find that this abandonment or neglect caused serious injury or illness or death of a livestock animal on at least one occasion. In summary, the record shows that the cattle were not fed in compliance with the University of Nebraska feeding guidelines, and that the cattle were malnourished and lethargic, with low body count scores, indicating that they were not fed as reasonably necessary for their health. For one animal, evidence established that malnourishment was the cause of death.

Briefly addressing the Schumans' argument that the State provided no meaningful criteria by which to judge the Schumans' failure to check the dam, we note that one of the Schumans' neighbors and witnesses at trial testified that he checks his cattle at least daily, and that there would be "good possibility" of danger if a rancher waited 4 or 5 days between checks.

Schumans' arguments regarding the sufficiency of the evidence supporting their convictions for the abandonment or cruel neglect of animals fail.

*Failure to Properly Dispose of Dead Animal.*

We next address the sufficiency of the evidence supporting Thomas' and Carl's convictions of failure to properly dispose of a dead animal. The Schumans allege that the jury was instructed to determine whether Thomas and Carl had failed to dispose of carcasses within 36 hours between January 1, 2019, and March 12, the day before the bomb cyclone. They argue that because the State was unable to prove how long the carcasses had been on the ranch, the timeframe charged by the State was not established.

We begin by noting that the Schumans were each charged with 13 counts of failure to properly dispose of a dead animal under § 54-744. That statute was repealed prior to trial. Section 54-744 was replaced by § 54-2946 (Cum. Supp. 2020), which substantively changed the statutory language by adding provisions related to events of disease, natural disaster, and general emergencies; the duties of county sheriffs related to proper disposal of a carcass; and the detection of anthrax in an animal death. See § 54-2946. Because § 54-2946 made substantive changes to the crime of improper disposal of a dead animal, § 54-744 governs the alleged events on the Schuman ranch in early 2019. See *Dragon v. Cheesecake Factory*, 300 Neb. 548, 915 N.W.2d 418 (2018) (holding statutes governing substantive matters in effect at the time of a crime govern, and not later enacted statutes). Section 54-744 requires the owner or custodian of any dead animal to dispose of the carcass within 36 hours after receiving knowledge of the animal's death, and provides an enumerated list of disposal methods including burial, composting, and transport to a licensed rendering establishment.

At trial, several individuals, including neighbors and law enforcement officials, testified to seeing numerous carcasses scattered on the Schuman ranch in January 2019, February, and March. Many of the 117 photographs submitted into evidence show dead cattle on the ranch in varying stages of decay. Some of the carcasses had been reduced to partial skeletons. Sholes testified that while he was unable to pinpoint the time of death for the cattle he observed on the April search of the ranch, he believed that many cows had been deceased for at least 30 days, and some for as much as 3 months. Deibler likewise testified that specific cows had likely died prior to the bomb cyclone.

- 10 -

We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. See *State v. Worthman*, 311 Neb. 284, 971 N.W.2d 785 (2022). Therefore, given the evidence regarding the number of carcasses and their varying stages of decomposition, and the obvious stench in the air resulting from the deceased cattle, a rational fact finder could have found that the State proved beyond a reasonable doubt that Thomas and Carl had knowledge of the cattles' death and failed to properly dispose of 13 dead animals within the time frame and means required by § 54-744. This assigned error also fails.

CONCLUSION

For the reasons set forth above, we affirm Thomas' and Carl's convictions.

AFFIRMED.